AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☑ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
11/19/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ASI _____ DEPTUY

United States of America,

v.

MAXIMO JORDAN NAVARRETE-CONTRERAS,
LUKE GREGORY GRABEEL, and
FELIPE DEJESUS ORTIZ,
 aka "Felipe Ramos Ortiz Sr.,"
 aka "Felipe DeJesus Ortiz Anaya,"

Defendants.

**FILED**
CLERK, U.S. DISTRICT COURT
11/19/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KL _____ DEPUTY

Case No.    2:24-mj-06967-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of February 6, 2024, through September 12, 2024, in the county of Santa Barbara in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Engaging in the Business of Dealing in Firearms without a License |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Christopher Stantzos*
*Complainant's signature*

Christopher P. Stantzos, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    November 19, 2024

_____
*Judge's signature*

City and state:    Los Angeles, California

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kelsey A. Stimson x8230

## AFFIDAVIT

I, Christopher P. Stantzos, being duly sworn, declare and state as follows:

### I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrants against Maximo Jordan Navarrete-Contreras ("NAVARRETE-CONTRERAS"), Luke Gregory Grabeel ("GRABEEL"), and Felipe DeJesus Ortiz ("ORTIZ") for a violation of 18 U.S.C. § 922(a)(1)(A) (unlawfully engaging in the business of dealing in firearms without a license) (the "Target Offense").

2.    This affidavit is also made in support of applications for warrants to search the following premises, vehicles, and persons believed to be located in the Central District of California:

   a.    A residential address in Santa Maria, California 93434 ("SUBJECT PREMISES 1"), as described more fully in Attachment A-1;[1]

   b.    A residential address in Nipomo, California 93444 ("SUBJECT PREMISES 2"), as described more fully in Attachment A-2;[2]

_____

[1] The identifiers listed in Attachment A-2 accurately describe SUBJECT PREMISES 2 based on surveillance I conducted and surveillance that another agent conducted and related to Google Maps images.

[2] The identifiers listed in Attachment A-1 accurately describe SUBJECT PREMISES 1 based on surveillance I conducted and surveillance that another agent conducted and related to Google Maps images

      c.   Storage Unit #1409, located at U-Haul Moving & Storage of Santa Maria ("SUBJECT PREMISES 3"), as described more fully in Attachment A-3;[3]

      d.   An approximately 53-foot box semi-truck trailer with California license plate number 4TG2379 and identifying numbers "27A" and "U36006" ("SUBJECT VEHICLE 1"), as described more fully in Attachment A-4;[4]

      e.   A Jayco travel/camper trailer bearing no license plate number ("SUBJECT VEHICLE 2"), as described more fully in Attachment A-5;[5]

      f.   A gray 2000 Dodge Dakota pickup truck bearing California license plate number 6G42195 ("SUBJECT VEHICLE 3"), as described more fully in Attachment A-6;[6]

      g.   A gray 2005 Acura sedan bearing California license plate number 5LZW050 ("SUBJECT VEHICLE 4"), as described more fully in Attachment A-7;[7]

---

[3] The identifiers listed in Attachment A-3 accurately describe SUBJECT PREMISES 3 based on information I obtained from U-Haul via Grand Jury subpoena.

[4] The identifiers listed in Attachment A-4 accurately describe SUBJECT VEHICLE 1 based on surveillance I conducted during controlled purchases of firearms and on other occasions.

[5] The identifiers listed in Attachment A-5 accurately describe SUBJECT VEHICLE 2 based on statements made by GRABEEL and surveillance I conducted.

[6] The identifiers listed in Attachment A-6 accurately describe SUBJECT VEHICLE 3 based on surveillance I conducted and surveillance other agents conducted during controlled purchases of firearms.

[7] The identifiers listed in Attachment A-7 accurately describe SUBJECT VEHICLE 4 based on surveillance I conducted and surveillance that another agent conducted.

h.    The person of NAVARRETE-CONTRERAS, as described more fully in Attachment A-8;[8]

i.    The person of GRABEEL, as described more fully in Attachment A-9;[9] and

j.    The person of ORTIZ, as described more fully in Attachment A-10.[10]

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (unlawfully engaging in the business of dealing in firearms and manufacturing firearms without a license), 18 U.S.C. § 922(d) (unlawful sale of firearms), 18 U.S.C. § 922(g)(1) (felon in possession of firearms and ammunition), 18 U.S.C. § 922(j) (possession of a stolen firearm), 18 U.S.C. § 922(o) (unlawful possession of a machinegun), 18 U.S.C. § 933 (trafficking in firearms), 26 U.S.C. § 5861(a) (unlawfully engaging in the unregistered business of manufacturing or dealing in firearms), 26 U.S.C. § 5861(d) (unlawful possession of unregistered firearms), 18 U.S.C. § 371 (conspiracy), and 21 U.S.C. § 841 (distribution of

---

[8] The identifiers listed in Attachment A-8 accurately describe NAVARRETE-CONTRERAS based on my review of DMV records, surveillance I conducted, and my review of video recordings of controlled purchases of firearms and drugs from NAVARRETE-CONTRERAS.

[9] The identifiers listed in Attachment A-9 accurately describe GRABEEL based on my review of DMV records, surveillance I conducted, and my review of video recordings of controlled purchases of firearms from GRABEEL.

[10] The identifiers listed in Attachment A-10 accurately describe ORTIZ based on my review of DMV records, surveillance I conducted, and my discussions with Undercover personnel involved in controlled purchases of firearms from ORTIZ.

and possession with intent to distribute controlled substances)
(the "SUBJECT OFFENSES"), as described more fully in Attachment
B.  Attachments A-1 through A-10 and B are incorporated herein
by reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested arrest warrants
and search warrants, and does not purport to set forth all of my
knowledge of or investigation into this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II.  BACKGROUND OF AFFIANT

5.    I am a Special Agent with the Bureau of Alcohol,
Tobacco, Firearms, and Explosives ("ATF") and have been so
employed since March 2020.  I attended the ATF Academy from
March through December 2020, where I received approximately
1,000 hours of formal training in various aspects of conducting
firearms, explosives, arson, firearms trafficking, and gang
investigations.  Before joining the ATF, I was an Intelligence
Analyst for the Federal Bureau of Investigation ("FBI") for
approximately four and a half years.  As an Intelligence
Analyst, I produced intelligence products in furtherance of
civil rights crimes investigations and complex international
money laundering investigations.  Before joining the FBI, I was

a forensic scientist for the Washington, DC Department of
Forensic Sciences, where I identified, documented, preserved,
and collected physical evidence from crime scenes for nearly two
years.

6.    As an ATF agent, I have debriefed multiple informants,
witnesses, and subjects who had personal knowledge regarding
illegal firearms and drug trafficking.  Additionally, I have
participated in many aspects of gang, firearms, and drug
trafficking investigations, including undercover operations,
arrests, physical and digital device search warrants, physical
and electronic surveillance, GPS tracker installations, and the
analysis of telephone call detail records.  I am familiar with
firearms and drug traffickers' methods of operation, including
the distribution, storage, and transportation of drugs, as well
as the collection of money proceeds of firearm-trafficking and
drug-trafficking, and money-laundering methods used to conceal
the nature of the proceeds.  I have conducted and participated
in multiple investigations involving the illegal manufacture and
sale of firearms.  I have assisted in the execution of multiple
search warrants for investigations related to the illegal
manufacture and sale of firearms and the sale of drugs.  I am
familiar with the methods employed by individuals involved in
firearms and drug trafficking to thwart detection by law
enforcement including the use of cellular telephone technology,
counter-surveillance techniques, false or fictitious identities
and addresses, money-laundering techniques, and coded language.

### III. __SUMMARY OF PROBABLE CAUSE__

7.    In early January 2024, an ATF confidential informant ("CI")[11] identified NAVARRETE-CONTRERAS as a source of firearms and drugs.  On or about January 16, 2024, the CI purchased approximately 105 grams of methamphetamine from NAVARRETE-CONTRERAS.  In early February 2024, NAVARRETE-CONTRERAS introduced the CI to GRABEEL as a manufacturer and supplier of firearms.  On or about February 6, 2024, GRABEEL sold the CI a .223 caliber AR-type rifle bearing no manufacturer's markings or serial number, commonly known as a "ghost gun."

8.    Since then, the CI and/or ATF undercover Special Agents ("UC 1" and "UC 2," collectively, "the UCs") conducted eight additional controlled purchases of firearms and ammunition from NAVARRETE-CONTRERAS and/or GRABEEL or ORTIZ in Santa Maria, California.  Specifically:

    a.    NAVARRETE-CONTRERAS, a two-time previously convicted felon, sold or was involved in the sale of seventeen firearms to the UCs or CI, including a machinegun, two short-barreled rifles, and a silencer.

    b.    GRABEEL supplied eight of the seventeen firearms sold to the UCs and was present during four controlled firearms transactions.  He also told the UCs and CI that he manufactured several of the firearms and planned to manufacture more.

_____

[11] The CI has been compensated approximately $4,200 thus far by the ATF for his/her assistance in this investigation.  The CI has a pending criminal case in the Central District of California for firearms and drug trafficking violations and has signed a cooperation agreement with the United States Attorney's Office.  The CI has been active for approximately two years and has consistently provided credible and reliable information.

c.   ORTIZ, a two-time previously convicted felon and Northwest criminal street gang affiliate, supplied six firearms to NAVARRETE-CONTRERAS to sell to the UCs or sold the firearms directly to the UCs during two controlled firearms transactions in September 2024.

9.   As discussed herein, **SUBJECT PREMISES 1** is believed to be the residence of NAVARRETE-CONTRERAS and he is believed to possess and store firearms there. **SUBJECT PREMISES 2** is believed to be the residence of GRABEEL and he is believed to possess and store firearms and evidence of firearms manufacturing and dealing there. **SUBJECT PREMISES 3** is a storage unit where NAVARRETE-CONTRERAS and ORTIZ sold UC-2 three firearms. **SUBJECT VEHICLES 1, 2, and 3** are vehicles that are believed to be registered to and/or used by GRABEEL and believed to be contain firearms and/or evidence of firearm manufacturing equipment. **SUBJECT VEHICLE 4** is a car that NAVARRETE-CONTRERAS drove to at least two controlled firearms transactions.

### IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

10.   Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   NAVARRETE-CONTRERAS Messaged the CI a Photo of a Privately Manufactured AR-Type Firearm from His Facebook Messenger Account.**

11.   In early January 2024, the CI contacted NAVARRETE-CONTRERAS via Facebook Messenger to determine if NAVARRETE-CONTRERAS was still engaged in criminal activities.   Based on my conversations with the CI, I am aware that the CI and

NAVARRETE-CONTRERAS had past mutual acquaintances within criminal street gangs in Santa Maria, California.  The CI knew NAVARRETE-CONTRERAS to criminally possess firearms in the past.

12.  On January 8, 2024, in a documented message that I have reviewed, NAVARRETE-CONTRERAS messaged the CI on Facebook Messenger (the "Messenger Account")[12] an image depicting a privately manufactured AR-type firearm (depicted below in Figure 1) and stated it was a .223/5.56 caliber firearm.  Following this, NAVARRETE-CONTRERAS provided the CI with his phone number ending in 4296 (the "4296 number").[13]

---

[12] Law enforcement identified NAVARRETE-CONTRERAS by running records checks for the vanity name associated with the Messenger Account, "Max Navarrete," and account name "Max.Contreras.1913," and comparing the photos associated with the account to NAVARRETE-CONTRERAS's driver's license photo.  I also viewed the electronic surveillance from the controlled purchases and confirmed that NAVARRETE-CONTRERAS was the person who showed up at the deal locations as described below.

[13] All phone calls and text messages between the CI and NAVARRETE-CONTRERAS were recorded and documented unless otherwise noted.  All messages NAVARRETE-CONTRERAS sent to the CI via the Messenger Account were documented, but not all audio calls made through the Messenger Account were recorded (due to the CI not having a recorder available during some of the unexpected calls).  I have reviewed the recorded messages and phone calls, which are summarized in substance and in part.



*Figure 1: Message from NAVARRETE-CONTRERAS using the Messenger Account around January 8, 2024.*

13. Between on or about January 10 and on or about January 16, 2024, in text messages and phone calls with NAVARRETE-CONTRERAS at the 4296 number that I have reviewed, the CI negotiated a purchase of methamphetamine. Specifically:

a. On or about January 14, 2024, the CI texted NAVARRETE-CONTRERAS to ask for a few "zips." Based on my training and experience, I am aware that "zips" is coded language for ounces of methamphetamine.

b. On January 15, 2024, during a recorded phone call, NAVARRETE-CONTRERAS asked, "How many did you need?" and said, "I could get 'em right now."

c. On January 16, 2024, the CI texted NAVARRETE-CONTRERAS to ask what the price of two or four ounces of methamphetamine would be, to which NAVARRETE-CONTRERAS replied, "4 for 400." In a recorded phone call later that day, NAVARRETE-CONTRERAS directed the CI to meet him at his residence in Santa Maria. The same day, the CI conducted a recorded

controlled purchase of approximately 105 grams of
methamphetamine from NAVARRETE-CONTRERAS for $450 in government
funds while law enforcement surveilled the transaction.[14]  During
the purchase, NAVARRETE-CONTRERAS described the firearm he had
previously shown the CI via the Messenger Account (pictured
above) as a short-barreled rifle with "a 10-inch barrel."

14.  I later showed the CI an unmarked California
Department of Motor Vehicles ("California DMV") photograph of
NAVARRETE-CONTRERAS.  The CI confirmed the person in the
photograph was the individual who sold him/her the
methamphetamine on January 16, 2024.

15.  Based on my review of certified criminal conviction
documents, I determined NAVARRETE-CONTRERAS was convicted of two
felonies by the Superior Court of California, County of Santa
Barbara: Carrying a Loaded Firearm in Public (California Penal
Code § 25850(a)) and Inflicting Corporal Injury:
Spouse/Cohabitant/Date (California Penal Code § 273.5(a)) in
2021 and 2023 respectively.

**B.    February 6, 2024: GRABEEL Sold the CI a Privately
Manufactured AR-Type Rifle.**

16.  On January 19, 2024, during a recorded phone call
between the CI and NAVARRETE-CONTRERAS using the 4296 number
that I reviewed, NAVARRETE-CONTRERAS told the CI his associate
had multiple firearms for sale and sent the CI seven images of

---

[14] During each controlled purchase, the CI and/or UCs were
equipped with monitoring and recording devices, and law
enforcement maintained surveillance of them and the subjects of
the investigation.  Law enforcement searched the CI and the CI's
vehicle before and after every controlled purchase.

three different privately manufactured firearms priced at
$2,500, $1,600, and $800.

17.  Between January 20 and January 25, 2024, in documented
messages and recorded phone calls via the 4296 number that I
reviewed, the CI and NAVARRETE-CONTRERAS arranged a firearms
transaction.  The CI agreed to purchase two of the firearms that
NAVARRETE-CONTRERAS had sent images of on January 19, 2024, for
$1,600 and $800 respectively, and NAVARRETE-CONTRERAS stated he
would inform the firearms supplier.  On January 25, 2024,
NAVARRETE-CONTRERAS messaged the CI from the 4296 number that
their firearms deal was "A GO on that for Tuesday."

18.  On January 30, 2024, the CI conducted a recorded
meeting with NAVARRETE-CONTRERAS in Santa Maria, California, and
I have reviewed the recording.  During the meeting, NAVARRETE-
CONTRERAS told the CI he could not get in contact with the
firearms supplier and described him as a "white boy" named
"Luke."  NAVARRETE-CONTRERAS then placed a recorded phone call
to "Luke" in front of the CI using the 4296 number.[15]  During the
call to an individual who identified themselves as "Luke" (later
identified by law enforcement as GRABEEL), NAVARRETE-CONTRERAS
and GRABEEL discussed going to GRABEEL's then-residence in Santa
Maria at a later date to conduct their firearms transaction.

---

[15] In May 2024, I requested Homeland Security Investigations
("HSI") Special Agent Jonathan Golden issue an administrative
subpoena for subscriber information and call detail records
("CDRs") for GRABEEL's phone number ending in x4887 (the "4887
number").  On May 21, 2024, I received these records from SA
Golden and confirmed that NAVARRETE-CONTRERAS, using the 4296
number, contacted GRABEEL, using the 4887 number, during the
CI's meeting with NAVARRETE-CONTRERAS on January 31, 2024.

19.  On February 4, 2024, NAVARRETE-CONTRERAS contacted the CI via recorded phone call that I have reviewed and he informed the CI that GRABEEL wanted to conduct a firearms transaction on February 6, 2024.

20.  On February 6, 2024, the CI and NAVARRETE-CONTRERAS traveled to GRABEEL's then-residence in Santa Maria, California, where they met GRABEEL, who introduced himself as "Luke."[16]  Upon arriving at the deal location to conduct surveillance, I observed **SUBJECT VEHICLE 1** and **SUBJECT VEHICLE 3** parked in the driveway along with multiple other pickup trucks.

21.  During the recorded meeting, which I have reviewed, GRABEEL claimed to have 10,000 rounds of ammunition and "100 pounds of boom, put a fucking hole in the ground."  GRABEEL stated he could "Wipe out this whole block," if law enforcement came for him, further stating, "I fucking hate the government."  GRABEEL showed the CI two firearms which he stated were "freshly built."  GRABEEL further claimed he and an associate built one of the firearms together and described the various modifications he made to it as "No serial number, TruGlo, and the 30-round magazine."  In addition, NAVARRETE-CONTRERAS asked about the length of the firearm's barrel, and GRABEEL told NAVARRETE-CONTRERAS how to measure the length of the barrel.  NAVARRETE-CONTRERAS and GRABEEL discussed NAVARRETE-CONTRERAS's personal

---

[16] Law enforcement identified GRABEEL by running records checks for the phone number he later provided the CI/UC, which was a phone number ending in 4887 (the "4887 number"), seeing that it was registered to GRABEEL, and comparing GRABEEL's California DMV driver's license photo to the person who showed up to the deals.

firearm, a short-barreled rifle, which GRABEEL said that he had "spent some time on." NAVARRETE-CONTRERAS then said, "I still haven't shot it. I'm still waiting for the right motherfucker."

  a. GRABEEL then asked NAVARRETE-CONTRERAS, "Did you see my fucking full-auto build? Freddy's fucking son's got it." GRABEEL then further described this firearm as a privately manufactured Glock-type pistol with a 50-round capacity drum magazine and a "Full-auto pin in that bitch." Based on my knowledge, training, and experience, I believe GRABEEL was referring to a machinegun conversion device, commonly known as a "Glock switch," when using the term "Full-auto pin."

  b. GRABEEL sold a privately manufactured black and silver-colored .223 caliber AR-type rifle bearing no serial number with an extended magazine and simulated ammunition rounds to the CI for $1,600 (depicted below as Figure 2).[17] GRABEEL said that the CI should wipe down the firearm for any fingerprints, "in case it gets into the wrong fucking hands." GRABEEL then showed the CI and NAVARRETE-CONTRERAS multiple firearms safes, firearms, and firearms parts and accessories



*Figure 2: Privately made firearm which GRABEEL sold to UC-1 on February 6, 2024*

---

[17] The CI handed NAVARRETE-CONTRERAS $1,600 in funds who handed it to GRABEEL.

inside **SUBJECT VEHICLE 1**.  The CI then provided NAVARRETE-CONTRERAS with $200 for arranging the firearms transaction.

22.  Later, I showed the CI an unmarked California DMV photograph of GRABEEL.  The CI confirmed the person in the photograph was the individual who sold him/her the privately made firearm on February 6, 2024.

      C.     **February 13, 2024: GRABEEL Sold the UC a Privately Manufactured Rifle, Ammunition, and Extended Magazine.**

23.  On February 10, 2024, the CI contacted NAVARRETE-CONTRERAS to ask if GRABEEL had firearms for sale.  Based on my conversations with the CI and review of recorded communications between the CI and NAVARRETE-CONTRERAS, I am aware that NAVARRETE-CONTRERAS told the CI he would contact GRABEEL and later arranged a firearms deal for February 13, 2024.

24.  On February 13, 2024, the CI and UC-1 met NAVARRETE-CONTRERAS and followed him to GRABEEL's then-residence in Santa Maria, California, where they met with GRABEEL.  Based on my review of the recorded footage of the meeting, I am aware that GRABEEL presented UC-1 with a privately manufactured 5.56x45mm caliber AR-type rifle bearing no serial number and a bronze-colored scope.  GRABEEL claimed, "we" built the firearm and that he had "sighted in" the firearm.  GRABEEL described how the firearm did not have any serial numbers.  GRABEEL then claimed to possess approximately 10,000 rounds of ammunition, including green-tipped ammunition which he claimed were "cop killers."

     a.   UC-1 asked if some privately made pistols GRABEEL were manufacturing would be available for sale once completed. GRABEEL replied, "everything's always for sale."

     b.   A short while later, GRABEEL sold the privately manufactured rifle (depicted below as Figure 3), 100 rounds of 5.56x45mm caliber ammunition, and an extended magazine to UC-1 for $2,600 in government funds.  UC-1 then provided NAVARRETE-



*Figure 3: Privately made firearm GRABEEL sold to UC-1 on February 13, 2024.*

CONTRERAS with $200 in government funds for arranging the firearms transaction.

    25.  Based on my review of video recordings of the controlled purchase, I am aware that **SUBJECT VEHICLE 1** was parked in the driveway of GRABEEL's residence during the deal.

    **D.  April 4, 2024: NAVARRETE-CONTRERAS Sold the CI a Machinegun and Privately Manufactured Silencer.**

    26.  On March 24, 2024, in a recorded phone call between the CI and NAVARRETE-CONTRERAS that I have reviewed, NAVARRETE-CONTRERAS stated he would call "old boy" and meet up with him. Based on my knowledge of this investigation, NAVARRETE-CONTRERAS referred to GRABEEL as "old boy."

    27.  On March 26, 2024, NAVARRETE-CONTRERAS called the CI in a recorded call that I have reviewed and told the CI that he

was with GRABEEL at his then-residence in Santa Maria.  On the following day, the CI conducted a recorded meeting with NAVARRETE-CONTRERAS at his residence in Santa Maria, California. Based on my review of the recorded meeting, NAVARRETE-CONTRERAS told the CI that GRABEEL was building two pistols and would tell NAVARRETE-CONTRERAS when he completed them.  NAVARRETE-CONTRERAS said he offered to let GRABEEL use his garage to make firearms.

28.  On April 3, 2024, the CI again met with NAVARRETE-CONTRERAS at his residence; however, the meeting was not recorded as the CI's recording device malfunctioned.  According to the CI, during the meeting, NAVARRETE-CONTRERAS showed the CI a STEN MKIII machinegun with a modified shoulder stock.  He told the CI that GRABEEL gave him this firearm and wanted to sell it for $2,000.  NAVARRETE-CONTRERAS also showed the CI a silencer he was selling for $700.  The CI took photos of both.  (Depicted below as Figure 4.)

29.  On April 4, 2024, during a recorded phone call that I have reviewed, the CI and NAVARRETE-CONTRERAS agreed to conduct a firearms transaction later that day.



*Figure 4: STEN MKIII machinegun (left) and silencer (right) NAVARRETE-CONTRERAS sold to the CI on April 4, 2024. GRABEEL later took credit for supplying and manufacturing the machinegun with an unidentified associate.*

30.  On the same day, the CI met NAVARRETE-CONTRERAS at his residence in Santa Maria, California.  Based on my review of the recorded footage from that meeting, I am aware that NAVARRETE-CONTRERAS sold the CI the modified STEN MKII machinegun bearing

16

serial number 94522 for $2,000 and the privately manufactured silencer for $700.  NAVARRETE-CONTRERAS told the CI, "I wanna try that full auto" and "Press that little button," referring to the button on the machinegun that switched its firing mode from semi-automatic to fully automatic.  The CI also asked NAVARRETE-CONTRERAS if GRABEEL vouched for the reliability of the STEN MKIII machinegun, which NAVARRETE-CONTRERAS confirmed he did.

31.  I sent the STEN MKII machinegun and silencer to the ATF Firearms Technology Control Branch (FTCB) to be examined. FTCB confirmed the STEN MKIII firearm was a machinegun, and the privately manufactured silencer was a silencer.

32.  I have reviewed messages from NAVARRETE-CONTRERAS at the Messenger Account to ORTIZ and saw that NAVARRETE-CONTRERAS sent ORTIZ[18] an image of the STEN MKIII machinegun on April 3, 2024, and stated, "The best part is that it shoots 9mm."

**E.  April 15, 2024: GRABEEL Sold the CI Two Privately Manufactured Rifles, Two Extended Magazines, and Ammunition.**

37.  Between April 9 and April 15, 2024, the CI and NAVARRETE-CONTRERAS exchanged a series of recorded phone calls and documented text messages regarding purchasing additional firearms, which I have reviewed.  On April 9, 2024, NAVARRETE-CONTRERAS told the CI that GRABEEL needed more time to complete two privately manufactured pistols and that GRABEEL wanted

---

[18] NAVARRETE-CONTRERAS, using the Messenger Account, communicated with a Facebook Messenger account with the vanity name, "Felipe Ortiz."  As described below, law enforcement later identified ORTIZ as a co-conspirator of NAVARRETE-CONTRERAS and GRABEEL.  I therefore believe that this "Felipe Ortiz" account is used by ORTIZ.

$1,000 for each.  On April 14, 2024, NAVARRETE-CONTRERAS and the CI confirmed a firearms transaction for the following day.

38.  On April 15, 2024, during a recorded phone call that I have reviewed, NAVARRETE-CONTRERAS told the CI that "Luke" had not been responding to his calls.  Later, NAVARRETE-CONTRERAS told the CI that GRABEEL had received the incorrect components to finish building the pistols.  NAVARRETE-CONTRERAS further stated he had "Three long ones right now."

a.  Based on my conversations with the CI and my review of the recorded footage from April 15, I am aware that the CI met NAVARRETE-CONTRERAS and GRABEEL at NAVARRETE-CONTRERAS's residence in Santa Maria, California, to conduct a controlled purchase of firearms.  Upon arrival, NAVARRETE-CONTRERAS and GRABEEL were both smoking what the CI believed to be methamphetamine.  GRABEEL then showed the CI two privately manufactured 5.56x45mm caliber AR-type rifles bearing no serial numbers and described the modifications he made to one rifle. He told the CI and NAVARRETE-CONTRERAS, "I wish you guys could've seen my fucking full auto fucking super fucking custom 9mm that was done by our hands."  He instructed the CI on how to identify machinegun conversion devices, claiming they were "Hard to get, but I can get em.  And they're not fucking cheap." GRABEEL also suggested it was illegal in California to possess a "ghost gun" or a "CNC machine."[19]

---

[19] "CNC" stands for "computer numerical control" and is an automated method of manufacturing that uses preprogrammed computer software to operate machine tools.

b.    GRABEEL agreed to sell one rifle to the CI for
$1,800.  He said that his associate wanted $2,250 for the second
rifle but the CI negotiated a price of $2,200.  GRABEEL said
that his associate was the "same guy who brings us those sub-
machineguns," and then explained how he and his associate
modified the STEN MKIII machinegun sold to the CI on April 4,
2024.  GRABEEL claimed the machinegun was from World War II and
originally had a metal stock, but he and his associate took a
wooden shoulder stock from a "Russian Nagant" and attached it.
The CI gave GRABEEL $4,000 in government funds for the two
privately manufactured rifles (depicted below as Figure 5), two
extended magazines, and 24 rounds of .223 caliber ammunition,
while GRABEEL provided NAVARRETE-CONTRERAS with $200 for
arranging the transaction.

 

*Figure 5: Privately made firearms GRABEEL sold to the CI on April 15, 2024.*

F.    **May 23, 2024: NAVARRETE-CONTRERAS Sold the CI Ammunition.**

43.    On May 23, 2024, the CI met with NAVARRETE-CONTRERAS
at his residence in Santa Maria, California.  During the
recorded meeting, which I have reviewed the footage of, the CI

purchased 95 rounds of .308 ammunition from NAVARRETE-CONTRERAS for $100 in government funds.

###### G.   **May 30, 2024: NAVARRETE-CONTRERAS Sold the UC Two Pistols, Including One Un-Serialized Pistol.**

45.   On or about May 27, 2024, NAVARRETE-CONTRERAS initiated an unrecorded audio call via the Messenger Account with the CI.  According to the CI, NAVARRETE-CONTRERAS stated on the call that GRABEEL had three firearms available for sale. NAVARRETE-CONTRERAS also offered to sell additional firearms from an unidentified supplier.

46.   Between May 28 and May 30, 2024, the CI and NAVARRETE-CONTRERAS engaged in recorded phone calls and documented text messages--which I have reviewed--to coordinate a firearms transaction with GRABEEL on May 30, 2024.  On May 30, 2024, NAVARRETE-CONTRERAS called the CI in a recorded call that I have reviewed and said that GRABEEL still had three firearms for sale.  Later that day, the CI and UC-1 met NAVARRETE-CONTRERAS at his residence in Santa Maria, California to conduct a controlled purchase of firearms.

47.   Based on my review of the recorded meeting, I am aware that NAVARRETE-CONTRERAS told the CI and UC-1 that GRABEEL had stopped responding to calls and texts.  NAVARRETE-CONTRERAS then placed two phone calls in front of the CI and UC-1.  During one call, he referenced a co-conspirator and arranged for two firearms to be delivered to his residence.  UC-1 then purchased two pistols: a Glock Model 17 Gen4 9mm pistol bearing serial number BKPD943, and a Polymer80 PF940C multi-caliber pistol

bearing no serial number from NAVARRETE-CONTRERAS for a total of $2,400 in government funds.

48.  Based on my review of an ATF report and conversations with law enforcement officers, I am aware that, during the controlled purchase, law enforcement observed a co-conspirator meet with NAVARRETE-CONTRERAS shortly before NAVARRETE-CONTRERAS sold UC-1 the two pistols.  The co-conspirator left the deal location before UC-1 and the CI arrived, but law enforcement observed the co-conspirator return to the deal location after UC-1 and the CI purchased the pistols from NAVARRETE-CONTRERAS and left.  Law enforcement then saw the co-conspirator again meet with NAVARRETE-CONTRERAS.

49.  On May 31, 2024, during a recorded phone call that I have reviewed, NAVARRETE-CONTRERAS told the CI that GRABEEL still had three firearms available for sale for $6,000 and that GRABEEL had said they were "from another party," meaning, based on my training and experience, that GRABEEL had obtained them from someone else.

**H.    June 3, 2024: GRABEEL Sold the UC Three Privately Manufactured AR-Type Rifles with Extended Magazines.**

50.  Between June 1 and June 3, 2024, the CI and NAVARRETE-CONTRERAS exchanged additional recorded phone calls and documented text messages--that I have reviewed--to facilitate a firearms transaction.  NAVARRETE-CONTRERAS sent the CI an image of three privately manufactured rifles with magazines.  On June 3, NAVARRETE-CONTRERAS told the CI that GRABEEL would be coming to meet them later that day to conduct a firearms transaction.

51.   Later that day, the CI and UC-2 met with NAVARRETE-CONTRERAS at his residence in Santa Maria, California to conduct a controlled purchase of firearms.  During the recorded meeting, GRABEEL drove to NAVARRETE-CONTRERAS's residence in **SUBJECT VEHICLE 3** and sold three privately manufactured .223 caliber AR-type rifles bearing no serial numbers (depicted below as Figure 6) and three extended magazines to UC-2 for $6,600 in government funds.  GRABEEL told UC-2 that he had a CNC machine but was unable to use it because he recently moved to Guadalupe, was working out of truck trailer (which I believe to be **SUBJECT VEHICLE 1** and/or **SUBJECT VEHICLE 2**) with generators, and was not good with computers. GRABEEL then provided UC-2 the 4887 number.



*Figure 6: Three privately made firearms GRABEEL sold to UC-2 on June 3, 2024.*

I.   **September 3, 2024: NAVARRETE-CONTRERAS and ORTIZ Sold UC-2 and the CI a Short-Barreled Rifle, a Stolen Rifle, a Privately Manufactured Rifle, Two Extended Magazines, and Ammunition.**

52.   In late August 2024, NAVARRETE-CONTRERAS used the Messenger Account to message the CI, "Call me I got 2 line[d] up to go south," which, based on my knowledge of the investigation, I understood as a reference to two firearms.

22

53.   On August 29, 2024, NAVARRETE-CONTRERAS called the CI
on a recorded phone call that I have reviewed and he stated:
"They have two clean ARs," which, based on my training and
experience, refers to AR-type firearms.  NAVARRETE-CONTRERAS
texted the CI an image of what appeared to be two privately
manufactured AR-type rifles with magazines loaded into them, and
various firearms parts and accessories in the background.

54.   On September 3, 2024, NAVARRETE-CONTRERAS initiated a
recorded phone call with the CI, which I have reviewed, and
claimed he could obtain six firearms to sell to the CI.  During
the call, I could hear NAVARRETE-CONTRERAS asking an unknown
individual questions about the firearms, including if the
firearms were brand-name Glocks and if they had serial numbers.

55.   Later that day, NAVARRETE-CONTRERAS and the CI engaged
in a series of documented messages and recorded audio calls via
the Messenger Account, which I have reviewed.  Specifically,
NAVARRETE-CONTRERAS texted the CI to "Bring at least 6k kuz it's
a few of them."  Later, NAVARRETE-CONTRERAS stated in a recorded
call that there would only be "3 ARs" because "The small ones
still haven't made their way over here from Chiques," using a
slang term for Oxnard, California.  NAVARRETE-CONTRERAS claimed
the small firearms would be "Ready for the next order."

56.   Based on my review of an ATF report and conversation
with law enforcement officers that were conducting surveillance
of NAVARRETE-CONTRERAS, law enforcement saw NAVARRETE-CONTRERAS
travel from **SUBJECT PREMISES 1** in **SUBJECT VEHICLE 4** to an

identified residence[20] in Santa Maria, California and enter the residence carrying a large backpack.  During this time, law enforcement observed an identified white pickup truck (the "White Truck") arrive at the identified residence.  Based on documented messages that I reviewed, I am aware that NAVARRETE-CONTRERAS then used the Messenger Account to message the CI and agree to meet at the deal location, a known business in Santa Maria, California, to conduct their firearms transaction for that day.  Law enforcement then saw NAVARRETE-CONTRERAS exit the residence with another individual (later identified as ORTIZ) and followed NAVARRETE-CONTRERAS and ORTIZ in **SUBJECT VEHICLE 4** to an identified street behind the deal location.  NAVARRETE-CONTRERAS and ORTIZ waited in **SUBJECT VEHICLE 4**.  Law enforcement then saw the White Truck arrive behind the deal location, and NAVARRETE-CONTRERAS and ORTIZ met with the driver of the White Truck.  Based on vehicle registration records and prior law enforcement encounters with and knowledge of the White Truck, law enforcement believed the driver of the White Truck to be a co-conspirator.  NAVARRETE-CONTRERAS and ORTIZ then drove in **SUBJECT VEHICLE 4** to the deal location and sold UC-2 and the CI three firearms, including a Mossberg MMR 7.62x39mm caliber

---

[20] Based on my conversations with Santa Maria Police Department ("SMPD") gang and intelligence detectives Ruben Peinado and Josh Yee, this residence was known to them to have been frequented and occupied by identified Northwest criminal street gang members and affiliates based on their prior investigations.

short-barreled rifle[21] bearing serial number MMR34235A, a stolen[22] Ruger Mini-14 .223 caliber rifle bearing serial number 184-59988, and a privately manufactured .223 caliber rifle for $5,000. (Depicted below as Figure 7.)   The firearms came with two extended magazines and five rounds of .223 caliber ammunition.   Immediately following the controlled purchase, law enforcement observed NAVARRETE-CONTRERAS and ORTIZ exit the deal location in **SUBJECT VEHICLE 4** and return to the White Truck, which had been waiting on the same street behind the deal location.   NAVARRETE-CONTRERAS and ORITZ entered the White Truck and remained there for an extended amount of time, before returning to **SUBJECT VEHICLE 4.**

  

*Figure 7: Short-barreled Mossberg rifle (left), stolen Ruger Mini-14 rifle (center), and privately made rifle (right) that NAVARRETE-CONTRERAS and ORTIZ sold to UC-2 on September 3, 2024.*

57.   I was later able to identify ORTIZ after reviewing toll records for the 4862 number from around the time of this controlled purchase.   I determined NAVARRETE-CONTRERAS's phone number ending in x4862 was in contact with a phone number ending in x9110, which was affiliated with ORTIZ in commercial

---

[21] I measured the barrel of this rifle and determined it to measure approximately 12.25 inches.

[22] Based on my query of the serial number of the Ruger Mini-14 rifle in NCIC, I determined the rifle was reported stolen by the Kern County Sheriff's Office in 2018.

databases.  In addition, NAVARRETE-CONTRERAS referred to ORTIZ as "Flip" in conversations with the CI.  Using this information, I obtained a California DMV photograph of ORTIZ and showed the unmarked photograph to UC-2 and the CI, who both confirmed the person in the photograph was the same individual who sold them the firearms on September 3, 2024.

      **a.**    I have also reviewed subscriber information and call detail records ("CDRs") for the 4862 number that showed NAVARRETE-CONTRERAS had two phone calls with a T-Mobile phone number ending in x9110 (the "9110 number") immediately preceding the controlled purchase of firearms.  Based on my query of the 9110 number in commercial databases, I determined it to be recently affiliated with ORTIZ; however, another administrative subpoena of the 9110 number revealed no subscriber information.

    58.    Based on my review of certified criminal conviction documents, I determined ORTIZ was convicted of two felonies by the Superior Court of California, County of Santa Barbara: Evading a Peace Officer (California Penal Code § 2800(a)(2)) and Previously Convicted Felon Carrying a Loaded Firearm (California Penal Code § 25850(c)(1)).

    **J.**    **September 12, 2024: NAVARRETE-CONTRERAS and ORTIZ Sold UC-2 Two Rifles, a Pistol, Extended Magazines, and Ammunition.**

    59.    Based on my review of documented messages, I am aware that, in mid-September 2024, the CI and NAVARRETE-CONTRERAS communicated using the 4862 number and the Messenger Account. On September 11, 2024, NAVARRETE-CONTRERAS sent the CI images of what appeared to be a silver Kimber pistol, a black privately

26

manufactured firearm with a pistol fin stock, and a black and
tan privately manufactured rifle with a stock capable of storing
an extra magazine.

60. Later that day, the CI contacted NAVARRETE-CONTRERAS
by a recorded phone call that I have reviewed and arranged to
purchase the firearms. During the call, NAVARRETE-CONTRERAS
claimed, "they" wanted to conduct the firearms transaction that
same day and wanted about $6,000 for all three firearms. In a
subsequent recorded phone call that I have reviewed, NAVARRETE-
CONTRERAS claimed, "these fools" were asking for a "deposit" for
the firearms that day and would "slide the Kimber right now" for
a deposit. The CI suggested they conduct their firearms
transaction the following day and NAVARRETE-CONTRERAS stated he
would, "Call 'em up and see what they say."[23]

61. On September 12, 2024, NAVARRETE-CONTRERAS initiated a
recorded call with the CI, which I have reviewed, and he stated,
"We are ready to roll." NAVARRETE-CONTRERAS also sent the CI
images on the Messenger Account claiming the firearms supplier
wanted $7,000 for all three firearms, but the supplier would
probably accept $6,500. NAVARRETE-CONTRERAS further claimed,
"There short like 10,000 for there shipment to get across the
boarder [sic]."

---

[23] According to CDRs for the 4862 number and 9110 number, on
September 11, 2024, the 4862 number (NAVARRETE-CONTRERAS) and
9110 number (ORTIZ) exchanged approximately 28 calls or texts,
some of which occurred immediately before or after NAVARRETE-
CONTRERAS contacted the CI to arrange the firearms transaction.
NAVARRETE-CONTRERAS and ORTIZ also exchanged approximately 23
calls or texts on September 12, the date of the firearms deal.

62.  Based on my review of an ATF report and conversation
with law enforcement officers, I am aware that law enforcement
observed NAVARRETE-CONTRERAS exit **SUBJECT PREMISES 1**, enter
**SUBJECT VEHICLE 4**, and travel to western Santa Maria, California
and pick up ORTIZ.  While there, ORTIZ removed what appeared to
ATF SA Bryan Traverso (who was conducting surveillance on
NAVARRETE-CONTRERAS and ORTIZ) to be a firearm from another
vehicle, before entering the front passenger seat of **SUBJECT
VEHICLE 4**.  Following this, law enforcement observed **SUBJECT
VEHICLE 4** drive eastbound towards downtown Santa Maria.

63.  At the same time, NAVARRETE-CONTRERAS, who had been
communicating with UC-2 via the 4862 number, told UC-2 he was
with the supplier of the firearms and asked where they should
meet.  UC-2 and NAVARRETE-CONTRERAS then agreed to meet at
NAVARRETE-CONTRERAS' storage locker inside of U-Haul Moving &
Storage of Santa Maria (**SUBJECT PREMISES 3**).

a.  I obtained records from U-Haul with a rental
contract for a storage unit in NAVARRETE-CONTRERAS's name at U-
Haul Moving & Storage of Santa Maria for Unit #1409 (**SUBJECT
PREMISES 3**).

64.  Next, UC-2 arrived at NAVARRETE-CONTRERAS's storage
locker and met with NAVARRETE-CONTRERAS, observing **SUBJECT
VEHICLE 4** parked inside.  NAVARRETE-CONTRERAS then led UC-2 to
his storage unit, **SUBJECT PREMISES 3**, where ORTIZ was standing
next to an open storage locker.  UC-2 recognized ORTIZ from the
prior firearms transaction on September 3, 2024.  Following
this, ORTIZ and NAVARRETE-CONTRERAS showed UC-2 an AK-style

ROMARM WASR-10 7.62x39mm caliber rifle bearing serial number 197ER3824.  UC-2 purchased this rifle (which included 10-round capacity magazine with three rounds of 7.62x39mm ammunition), a privately manufactured 7.62x39mm caliber short-barreled (approximately 7.125 inches) rifle bearing no serial number (which included an extended magazine), and a Kimber Stainless LW .45 caliber pistol bearing serial number K672194 and provided NAVARRETE-CONTRERAS with $6,500 in government funds.  (Depicted below as Figure 8.)  UC-2 then asked NAVARRETE-CONTRERAS and ORTIZ about previously discussed Glock pistols for sale (refer to the September 3, 2024, controlled purchase of firearms).  NAVARRETE-CONTRERAS stated the pistols were $1,700 each and not profitable and ORTIZ stated they were selling like hot cakes.



*Figure 8: Privately made short-barreled rifle (left), ROMARM WASR-10 rifle (center), and Kimber pistol (right) that NAVARRETE-CONTRERAS and ORTIZ sold to UC-2 on September 12, 2024.*

### K.    NAVARRETE-CONTRERAS, GRABEEL, and ORTIZ Do Not Have Federal Firearms Licenses or Firearms Registered with the National Firearms Registration and Transfer Record

65.  A Federal Firearms License ("FFL") is required to engage in the business of dealing in firearms.  Under the National Firearms Act, certain firearms and other items must also be registered with ATF in the National Firearms Registration and Transfer Record ("NFRTR").  As defined in 26

U.S.C. § 5845, firearms requiring registration include short-barreled rifles.

66.    In or around February 2024, ATF Industry Operations Investigators ("IOIs") queried the Federal Licensing System ("FLS") database, which is used to track the issuance of FFLs, and the NFRTR to determine if GRABEEL ever had an FFL or ever registered any items in the NFRTR.  According to these queries, GRABEEL never had an FFL or registered any firearms in the NFRTR.

67.    In October 2024, ATF IOIs queried FLS and the NFRTR to determine if NAVARRETE-CONTRERAS or ORTIZ ever had an FFL or ever registered any items in the NFRTR.  According to these queries, neither of them ever did.

68.    According to my queries of the California Automated Firearm System, which maintains a registry of firearms purchased and privately owned in California, GRABEEL had at least 19 firearms registered in his name as of February 2024.  This total does not include privately manufactured firearms or firearms purchased through private party transfers.

**L.    Identification of SUBJECT PREMISES 1, 2, and 3 and SUBJECT VEHICLES 1, 2, 3, and 4**

69.    **SUBJECT PREMISES 1:**  NAVARRETE-CONTRERAS is believed to have resided at **SUBJECT PREMISES 1** since approximately July 2024 and is believed to possess and store firearms there.[24]  As

---

[24] From at least January 2024 through approximately July 2024, NAVARRETE-CONTRERAS resided at known apartment unit in Santa Maria, California, where he openly displayed his personal
*(footnote cont'd on next page)*

discussed herein, on September 3 and September 12, 2024, law enforcement saw NAVARRETE-CONTRERAS leave **SUBJECT PREMISES 1** and drive **SUBJECT VEHICLE 4** to the controlled deal locations.

70. **SUBJECT PREMISES 2:** GRABEEL is believed to have primarily resided at **SUBJECT PREMISES 2** since approximately September 2024. In October 2024, I obtained a cell-site and location data warrant for GRABEEL's most recently used phone number ending in 4874 (the "4874 number"). (Case Number 2:24-mj-06333.) According to the warrant returns provided by T-Mobile, the 4874 number has primarily been located approximately[25] at **SUBJECT PREMISES 2** during overnight hours since October 17, 2024, and around **SUBJECT VEHICLES 1, 2, and 3** during some daytime hours. I also queried commercial databases for the 4874 number and determined it to be affiliated with GRABEEL via Reverse Phone Gateway information, which is generally provided to the commercial databases by phone carriers. In addition, I obtained CDRs and subscriber information for the 4874 number via administrative subpoena from DEA SA Botzet and determined the 4874 number was registered to GRABEEL at **SUBJECT PREMISES 2.** GRABEEL likely possesses and stores firearms and evidence of firearms manufacturing and dealing at this location.

71. **SUBJECT PREMISES 3:** NAVARRETE-CONTRERAS has rented a storage unit (#1409) at this location, U-Haul Moving & Storage

---

firearm and hosted multiple firearms transactions and one methamphetamine transaction with the CI, UCs, and GRABEEL. NAVARRETE-CONTRERAS moved residences in or around July 2024.

[25] The accuracy of the prospective cell-site data or "pings" varies based on cell service at the time of the location ping.

of Santa Maria, since June 26, 2024, according to records
provided by U-Haul.  On September 12, 2024, NAVARRETE-CONTRERAS
and ORTIZ met UC-2 at **SUBJECT PREMISES 3** and sold UC-2 three
firearms.

72.  **SUBJECT VEHICLES 1 and 2:**  In February 2024, I
observed **SUBJECT VEHICLE 1** on the driveway of GRABEEL's former
residence at 4153 Mayfield Street Santa Maria, California 93455.
GRABEEL sold firearms to the CI and UC-1 on two occasions at
that location and showed the CI and NAVARRETE-CONTRERAS multiple
safes containing firearms and firearms parts and accessories
inside **SUBJECT VEHICLE 1.**  I observed several other pickup
trucks and a semi-truck cab with an "Everett Grabeel" logo
parked at this location during those firearms transactions.
During one of those transactions, GRABEEL claimed to possess
explosives.  In April and June 2024, GRABEEL told the CI and UC-
2 that he was living in Guadalupe and working out of a trailer
with generators.  In September and October 2024, I observed
**SUBJECT VEHICLE 1**, pickup trucks I had previously observed at
4153 Mayfield Street, and a semi-truck cab with an "Everett
Grabeel" logo, parked in a dirt lot in Guadalupe, California,
which appeared to be used by multiple entities to store big rig
trucks, haul debris, and conduct commercial activities.  I also
observed **SUBJECT VEHICLES 2 and 3** parked near **SUBJECT VEHICLE 1**.
GRABEEL likely possesses and stores firearms, firearm
manufacturing equipment, and possibly explosives at this
location.  Based on my surveillance of the area in which SUBJECT
VEHICLES 1-3 were located in September, October, and November

2024, I believed it was likely that GRABEEL was living in SUJBECT VEHICLE 2 when he stated he was living in Guadalupe, California in June 2024, as I observed SUBJECT VEHICLE 2 to be located in the immediate vicinity of SUBJECT VEHICLES 1 and 3.

      a.  **SUBJECT VEHICLE 3:**  Law enforcement has observed GRABEEL operate this vehicle to travel to a deal location to supply and sell firearms to UC-2.  On October 28, 2024, SA Traverso observed **SUBJECT VEHICLE 3** parked in the driveway of **SUBJECT PREMISES 2.**  This vehicle is registered to GRABEEL, but the registration was suspended as of September 2023.

73.  **SUBJECT VEHICLE 4:**  Law enforcement has observed NAVARRETE-CONTRERAS operate this vehicle on several occasions between August and October 2024 and use it to travel to two controlled firearms transaction deal locations in September 2024.  This vehicle is registered to NAVARRETE-CONTRERAS' girlfriend.

## V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

74.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

      a.  Persons who manufacture, possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence or vehicles, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own

firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

        b.    Persons who manufacture, possess, purchase, or sell firearms often keep their firearms and any associated manufacturing equipment in their residence or vehicles, or in places that are readily accessible, and under their physical control, such as stash houses.

        c.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

        d.    Those who illegally manufacture or possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals

engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

      e.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DRUG OFFENSES

75. Based upon my training and experience and my participation in this investigation, I know that:

      a.   Drug traffickers often places assets, including apartments, houses, vehicles, and telephones, in names other than their own to avoid detection of these assets by government agencies. Although these assets are held in other names, the drug dealers actually know or use these assets and exercise dominion and control over them. Records relating to these assets are frequently found in their residences and other locations controlled by them.

      b.   Persons involved in drug trafficking conceal in their vehicles, residences, and businesses; controlled substances, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value, and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending money made from engaging in narcotic trafficking

activities.  Money, tangible property and records relating to
these assets are frequently found in their residences and other
locations controlled by them.

c.   Drug traffickers often carry, on their person or
maintained in secure locations, weapons to protect themselves
and their controlled substances from theft by other users,
traffickers, or criminals, and from seizure by law enforcement
agencies.  Drug traffickers store these weapons in their
residences, vehicles, and/or businesses and stash houses, or
other locations controlled by them.

d.   Drug traffickers commonly maintain addresses or
telephone numbers in books, papers, computers, cellular
telephones and other electronic data storage devices, and other
information that reveals the names, addresses, and/or telephone
numbers for their associates in the drug trafficking
organization, even if that information may be in code.  Records
and electronic devices of this sort are frequently found on the
persons of drug traffickers or in their residences, motor
vehicles, and other locations controlled by them.

e.   Drug traffickers frequently take, or cause to be
taken, photographs and/or videos of themselves, their
associates, or their property.  Records in the form of
photographs and/or videos are often found in the residences,
offices, or other places under the control of drug traffickers,
and provide valuable evidence of the conspiratorial
relationships.  Records of this type are sometimes in hard copy,
but are increasingly found stored on computers, cellular

telephones, thumb drives, and other items possessing the
capability of storing electronic data.

       f.   Drug traffickers often keep equipment and
materials for packaging, cutting, weighing, manufacturing, and
distributing controlled substances in their homes, stash houses,
or other locations controlled by them.  That drug paraphernalia
often includes, but is not limited to, scales, plastic wrap,
plastic bags, surgical gloves, presses, and cutting agents as
well as aromatic substances such as soap, dryer sheets, wood
shavings, and heat sealers, which are used to mask the odor of
illegal drugs in an attempt to avoid detection by drug detection
dogs.  Large-scale drug traffickers sometimes use money counting
machines to help count and sort the proceeds of drug
trafficking.

       g.   Drug traffickers commonly consign controlled
substances and weapons to their clients and couriers.  They
frequently maintain books, records, receipts, notes, ledgers,
airline tickets, money orders, and other papers relating to the
transportation, ordering, sale, and distribution of controlled
substances.  Records of this type are kept in location where
traffickers have ready access to them, including on their person
or in their residences, vehicles, businesses, stash houses, and
smart telephones, tablets, and personal computers.  Drug and gun
traffickers also normally maintain these items and records for
long periods of times, regardless of whether their value to the
dealer has diminished. Oftentimes, this type of evidence is
generated, maintained, and then forgotten about.  Thus documents

that one would think a prudent person would destroy because of their incriminatory nature are still possessed months or even years after the documents came into the possession of the drug dealer. Oftentimes, these individuals do not even realize the incriminatory nature of the documents they keep.  Documentary evidence dating back years is sometimes found in residences and other locations controlled by traffickers.

        h.   It is common for drug dealers to "front" (provide on consignment) controlled substances to their customers; conceal contraband, the proceeds of drug sales, and store drugs/firearms and cash in remote locations sometimes referred to as "stash houses;" maintain records of drug and gun transactions; and use cellular telephones to facilitate their illegal distribution operations.

        i.   Drug/weapons trafficking is an illicit business and an ongoing process requiring the development, use, and protection of a communication network to facilitate daily drug distribution.  Drug dealers use various methods to thwart law enforcement detection, including frequently changing cellular phones and vehicles, using various aliases, and uses coded communications.

        j.   Drug traffickers frequently refer to illicit drugs and guns in guarded conversations and frequently use code words when referring to controlled substances or money.

        k.   Persons who reside in or who are using a particular residence will often have documents, bills, and correspondence that list their names and addresses in that

residence.  Documents such as personal telephone books, address books, utility company receipts, keys, personal letters, rent receipts, mortgage documents, clothing, and other articles of personal property would tend to establish residency at a particular location and provide valuable evidence concerning ownership and control over areas in which drugs or other incriminating evidence are found.  Records and documents of this type may also be found in hard copy or stored electronically on computers, mobile telephones, and other media that stores data electronically.

## VII.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[26]

76.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur

---

[26] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

       b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

77.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

78.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the thumb- and/or fingers of NAVARRETE-CONTRERAS, GRABEEL, and/or ORTIZ on the device(s); and (2) hold the device(s) in front of the face of NAVARRETE-CONTRERAS,

GRABEEL, and/or ORTIZ with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

79.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.    CONCLUSION

80.  For all of the reasons described above, there is probable cause to believe that NAVARRETE-CONTRERAS, GRABEEL, and ORTIZ committed a violation of 18 U.S.C. § 922(a)(1)(A) (unlawfully engaging in the business of dealing in firearms without a license), and that the items to be seized described in Attachment B will be found in a search of the locations described in Attachments A-1 through A-10.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 19th day of
November 2024.

_Alicia G. Rosenberg_
_____
THE HON. ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE