CHARLES C. BROWN, ESQ. (Bar No. 179365)
(E-Mail: charlesbrown@parzivalgroup.com)
1 South Fair Oaks Avenue, Suite 204
Pasadena, California 91105
Telephone: (626) 594-4874

Attorney for Defendant
MAXIMO NAVARRETE-CONTRERAS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. CR 24-734-SVW |
|---|---|
| Plaintiff, | **DEFENDANT'S POSITION RE: SENTENCING; EXHIBITS** |
| v. | Date:    May 11, 2026 |
| MAXIMO NAVARRETE-CONTRERAS, | Time:    11:00 a.m. |
| | Location: Courtroom of the Hon. Stephen V. Wilson |
| Defendant. | |

Defendant MAXIMO JORDAN NAVARRETE-CONTRERAS, by and through his counsel of record, Charles C. Brown, hereby submits his Position Re: Sentencing and asks the Court to consider the sentencing factors set forth in 18 U.S.C. § 3553(a) in light of the unusually difficult life Mr. Navarrete-Contreras has lived.

Respectfully submitted,

DATED:  May 5, 2026                  By: *Charles C. Brown*

CHARLES C. BROWN

## I.  INTRODUCTION

Maximo Jordan Navarrete-Contreras is a thirty-three-year-old father of two whose life was shattered before it ever truly began. At the age of six, his mother — described by his family as "the glue of our family" — was killed in a car accident in which Maximo himself was ejected from the vehicle, suffered a traumatic brain injury, and lay in a coma. PSR ¶ 140. When he woke, he learned his mother was gone. He never recovered.

What followed was a childhood that reads like a Probation Office checklist of every adverse experience research now recognizes as a driver of later antisocial behavior. His grieving father turned to alcohol and prescription pain pills, locked himself in his bedroom, and stopped working. PSR ¶ 140. By age seven, Maximo was being raped by a neighbor — for nearly a year. PSR ¶ 141. He went to bed hungry. His family siphoned electricity from neighbors because they could not afford their own. PSR ¶ 140. He was placed in special education in elementary school after testing revealed a Specific Learning Disability and a Global Nonverbal Intelligence Quotient of 66 — in the borderline range. He bounced between six elementary schools. He was bullied for being poor and overweight.

At twelve, his father dropped him off at school one morning and never came back. PSR ¶ 142. He did not see his father again until years later, when he ran into him outside a liquor store, both of them homeless. PSR ¶ 144. By thirteen, Maximo was on the streets, sleeping behind a cousin's barber shop and stealing to pay for motel rooms so he could shower. PSR ¶¶ 143-44. By the same age he had begun smoking methamphetamine and marijuana, the substances that would become the only consistent companions of his adult life. PSR ¶¶ 156-57. He twice attempted suicide by slitting his wrists. PSR ¶ 152.

The United States Probation Office surveyed all of this and reached the only sensible conclusion. Citing the "loss of his mother at a young age, suffering a traumatic

brain injury, history of sexual abuse, bullying, lack of youthful guidance, homelessness, and substance abuse history," the Probation Officer identified Mr. Navarrete-Contreras's history as a basis for "a sentence outside of the advisory guideline system." PSR ¶¶ 213-14. The Probation Office recommends a sentence of 120 months — the statutory mandatory minimum on Count One.

The defense joins that recommendation. A sentence of 120 months — ten years — is itself an enormous punishment. It is more than three times the sentence imposed on co-defendant Luke Grabeel (37 months), the man who actually built and priced the firearms at issue, and twenty-four months more than the sentence imposed on co-defendant Felipe DeJesus Ortiz (96 months). PSR ¶¶ 14-15. The 10-year mandatory minimum on Count One reflects Congress's judgment about the seriousness of distributing more than 50 grams of actual methamphetamine. It is not a starting point. It is a floor that already accounts for Mr. Navarrete-Contreras's role and the harms of his conduct. A sentence above that floor — as the government urges — would punish Mr. Navarrete-Contreras for being the most damaged of the three co-conspirators, not the most culpable.

For the reasons set forth below, Mr. Navarrete-Contreras respectfully requests that this Court impose a sentence of 120 months' imprisonment, followed by five years of supervised release, with recommendations that he be designated for the Bureau of Prisons' Residential Drug Abuse Program (RDAP) and to a facility as close as possible to Santa Maria, California, so he can maintain contact with his two young children.

## II.   OBJECTIONS TO THE PRE-SENTENCE REPORT

The defense has no material objection to the factual recitations in the Revised Presentence Report. The defense does, however, address two Guidelines points that affect the advisory calculation.

3

## A.    Acceptance of Responsibility — U.S.S.G. § 3E1.1(b)

The original Presentence Investigation Report applied the full three-level reduction under U.S.S.G. § 3E1.1(a) and (b), arriving at a total offense level of 29 and an advisory range of 108 to 135 months. The Revised PSR, filed May 1, 2026, removed the additional one-level reduction at the government's urging — recalculating the total offense level at 30 and the advisory range at 121 to 151 months. Revised PSR ¶¶ 96-97. The government's rationale is that Mr. Navarrete-Contreras did not notify the government of his intent to plead until the morning of trial. *See* Dkt. 160 at 9-11. Notably, the United States Probation Office's sentencing recommendation has not changed. USPO continues to recommend a sentence of 120 months — the statutory mandatory minimum on Count One. *See* Dkt. 158.

The defense recognizes that the additional one-level reduction is committed to the government's discretion. The defense submits, however, that the government's reasoning carries little weight in this case for two reasons. *First*, the conditional plea preserves only the discrete legal question of the Court's ruling on the entrapment defense; it does not affect the factual basis or the underlying admissions of guilt. *See* Plea Agreement (Dkt. 123). *Second*, Mr. Navarrete-Contreras's hesitation in entering a guilty plea cannot be divorced from his cognitive deficits. He is a man with a documented traumatic brain injury, a Specific Learning Disability, and a Global Nonverbal IQ in the borderline range. PSR ¶¶ 151, 170. He has, by all accounts, fully accepted responsibility — he stipulated to the factual basis of the Plea Agreement during his presentence interview. PSR ¶ 47. The Court should not allow this discretionary one-level adjustment to drive the sentencing decision.

In any event, the dispute is largely academic. Whether the Court adopts the Probation Office's calculation (offense level 29; range 108-135) or the government's calculation (offense level 30; range 121-151), the statutory mandatory minimum of 120 months controls. *See* 21 U.S.C. § 841(b)(1)(A)(viii). A sentence of 120 months is at the

bottom of one range and one month below the bottom of the other; either way, the variance the defense requests (if any) is at most a single month — a *de minimis* deviation justified many times over by the § 3553(a) factors discussed below.

## B. Defense Guideline Calculation

| | |
|---|---:|
| Base Offense Level [§ 2D1.1(a)(5), (c)(5)] (Count Group 1) | 30 |
| Base Offense Level [§ 2K2.1(a)(3)] (Count Group 2) | 22 |
| 8–24 firearms [§ 2K2.1(b)(1)(B)] | +4 |
| No serial number [§ 2K2.1(b)(4)(B)] | +4 |
| § 2K2.1(b) cap | 29 |
| Multiple Counts [§ 3D1.4] | +2 |
| Combined Adjusted Offense Level | 32 |
| Acceptance of Responsibility [§ 3E1.1(a) and (b)] | −3 |
| **Total Offense Level** | **29** |
| Criminal History | III |
| **Advisory Guideline Range** | **108–135 months** |
| **Statutory Mandatory Minimum (Count 1)** | **120 months** |

## III. SENTENCING PRINCIPLES APPLIED TO THIS CASE

Consideration of the factors set forth in 18 U.S.C. § 3553(a), as applied to the circumstances of the instant offense and to Mr. Navarrete-Contreras, supports the imposition of a sentence at the statutory mandatory minimum of 120 months.

### A. Nature and Circumstances of the Offense

There is no question that the offenses of conviction are serious. Mr. Navarrete-Contreras sold approximately 102.5 grams of actual methamphetamine to a confidential informant in January 2024. PSR ¶¶ 18-19. Between February and September 2024, he and his co-conspirators sold seventeen firearms, a silencer, and ammunition — including a STEN MKII machinegun and two firearms without serial numbers. PSR ¶¶ 21-40. The defense does not minimize the gravity of this conduct, and Mr. Navarrete-Contreras has not asked the Court to do so.

5

But the Probation Office's own findings frame the conduct in important context. *First*, with respect to the firearms conduct, the Probation Office expressly concluded that Mr. Navarrete-Contreras occupied a "medium" level of culpability — neither the leader nor the supplier. PSR ¶ 88. Co-defendant Grabeel built the firearms, set the prices, and dictated terms. PSR ¶¶ 22-30, 87. Mr. Navarrete-Contreras "appears to have profited very little" from the entire firearms scheme — $200 per arranged transaction, on three of nine occasions. PSR ¶ 87. He was, in the Probation Office's words, "instrumental" but "not a leader or organizer." PSR ¶ 88.

*Second*, with respect to the methamphetamine count, the Probation Office found that Mr. Navarrete-Contreras conducted a single sale to the CI; that the source of the drugs is unknown; and that "[t]here is no evidence to suggest that Navarrete-Contreras recruited any co-conspirators or directed anyone's actions." PSR ¶ 63. He told the Probation Officer the truth: he participated "because he needed money to support his daily drug habit." PSR ¶ 166. On the day of his arrest, he was under the influence of methamphetamine and marijuana. *Id.* This is a case of an addicted man making sales to support an addiction, not of a calculating distributor building a network.

*Third*, the offense conduct here was driven from the outside in. An ATF confidential informant identified Mr. Navarrete-Contreras as a target in early January 2024 and, over the next nine months, repeatedly returned to him with requests for firearms and ammunition. PSR ¶¶ 17-39. The Court has, of course, ruled on the entrapment defense; the defense is not relitigating that ruling here. But the chronology — nine separate transactions, each prompted by the CI — is relevant context for assessing the "nature and circumstances of the offense" under § 3553(a)(1).

### B.   History and Characteristics of Defendant

The history and characteristics of Mr. Navarrete-Contreras are the heart of the defense's request. His life is the kind that the Probation Office, the social history report,

6

and the Court's own records describe in unflinching terms. The Probation Office itself flagged it as a basis for a sentence outside the Guidelines. PSR ¶¶ 213-14.

### 1.    Tragic Early Childhood Trauma and Abandonment

Mr. Navarrete-Contreras was born on February 27, 1993, in Santa Maria, California, the youngest of five children of Maximo Navarrete-Contreras, Sr. and Josefina Navarrete. PSR ¶ 137. From birth to age six, he lived with both parents in government housing in a low-income, gang-affected section of Santa Maria. PSR ¶ 139. His mother worked as a caregiver to an elderly couple. His father was a "very talented mechanic." PSR ¶ 147. Although the family was poor and the neighborhood was violent, he felt loved. He described his mother as "the glue of our family." PSR ¶ 139. On September 18, 1999, when Maximo was six years old, his mother was killed in a car accident. The family had been driving to Santa Barbara to visit his oldest brother, Saul, who had been hospitalized in a diabetic coma. Maximo's father was driving. Maximo was ejected from the vehicle, suffered a traumatic brain injury, and was placed in a coma. He was paralyzed for six months. He suffered from crossed eyes for some time afterward. He was hospitalized for approximately two months. PSR ¶ 140; Social History Report at 1-2.

When he woke from the coma, he learned his mother had not survived. *Id.* "After he watched his mother's burial," the Probation Officer recounts, "he became numb to everything around him." PSR ¶ 140.

His father's collapse was nearly total. He "began drinking on a daily basis, abusing prescription pain pills, and quit going to work." PSR ¶ 140. He "would shut himself in his bedroom and drink all day." *Id.* The family lost the home. Maximo went to bed hungry. The family siphoned electricity from neighbors. *Id.* Records reflect that more than seven referrals for neglect were filed against the father between 2001 and 2004, alleging that Maximo — at ages two through five — was left unsupervised,

delegated to incompetent caregivers, or simply left while his father was in Mexico. Social History Report at 4-5.

Noe Mendoza, Maximo's longtime friend (whom Maximo calls his cousin) confirmed the descent. He told the Probation Officer that "it was heartbreaking to watch what happened to Navarrete-Contreras' family, and how much neglect Navarrete-Contreras suffered afterward." PSR ¶ 147.

### 2. Sexual Abuse, Bullying, and a Special Education Childhood

At age seven, Mr. Navarrete-Contreras was raped by a neighbor over a period of approximately one year, until the neighbor moved away. PSR ¶ 141. He never disclosed this abuse during his childhood. He has lived with it ever since.

School was no refuge. The traumatic brain injury he suffered at six — together with the complete absence of support at home — manifested in school as a Specific Learning Disability. He was placed in special education classes beginning in fourth grade. Social History Report at 3. He was retained in first grade. He attended six different elementary schools between kindergarten and sixth grade. *Id.* In 2008, when he was fifteen, a court-ordered psychological evaluation by Marcus H. Shira, Ph.D., produced these findings:

- A Global Nonverbal Intelligence Quotient of 66 — in the borderline range.
- A Pictorial Nonverbal IQ of 91 (low average).
- A Geometric Nonverbal IQ of 77 (low average, sixth percentile).
- "Highly elevated symptoms" of cognitive dysfunction and executive functioning deficits, including inattention, impulsiveness, and poor concentration.
- Elevated symptoms in psychotic symptoms, attention and vigilance, and asocial behavior.
- A formal diagnosis of Specific Learning Disability requiring special education and related services.

Social History Report at 7-8. He was further diagnosed with an Adjustment Disorder with Mixed Disturbance of Emotions and Conduct (Chronic), a Parent-Child Relational Problem, and reading, mathematics, and written-expression disorders. Social History Report at 6. School personnel reported that the father's substance abuse and unresolved trauma made him "not available, consistent, or appropriately involved in Maximo's academic achievement." *Id.* He was bullied at school for "lack[ing] proper clothing, shoes," and being overweight. PSR ¶ 141. He acted out as "a cry for help that was only met with disciplinary action including being placed in detention or suspension several times per week." *Id.*

Despite all of this, the contemporaneous records reflect a child who *wanted* to be good. His IEP teacher wrote in 2008: "He is a very comical young man to speak with and always seem to have a smile on his face. He has turned in all assignments and received a B on first test. . . . He works hard and always has a smile on his face." Social History Report at 4-5. When asked by Dr. Shira what he would wish for if granted three wishes, fifteen-year-old Maximo said he only needed two: to graduate from college, and to join the soccer, basketball, or football teams. He told the psychologist he wanted to be the first person in his family to finish high school. Social History Report at 7.

### 3.     Homelessness at Twelve

At age twelve, Mr. Navarrete-Contreras's father dropped him off at school one morning and told him he would pick him up at the end of the day. He never came. PSR ¶ 142. The principal told Maximo that the school had called the police. Frightened, Maximo ran. *Id.* He did not return for approximately a month. *Id.* He never lived with his father again. By age thirteen, he was homeless. PSR ¶ 143. He stayed with friends when he could. He stole — by his own admission to the Probation Officer — "in order to pay for a motel room to shower and sleep in." PSR ¶ 144. He spent holidays alone. His older cousin, Noe, would let him sleep behind the family barber shop. *Id.* At fourteen, he was an associate of several Santa Maria gangs not

9

because he sought membership but because, as the Probation Officer observed, those gangs "provided shelter and support to young Navarrete-Contreras, who was operating in survival mode." PSR ¶ 143.

It was in this period that he attempted suicide twice, between the ages of thirteen and fourteen, by slitting his wrists. PSR ¶ 152.

### 4. The Salvation Army Years — and What They Show

In 2016, at age twenty-three, Mr. Navarrete-Contreras was ordered into residential treatment as a condition of probation in a state misdemeanor case. PSR ¶ 168. He completed the Salvation Army Adult Rehabilitation Center program in Santa Monica from September 2016 to November 2017 — successfully — and was then placed in a sober-living facility in West Hollywood. PSR ¶¶ 168-69; Social History Report at 14. He was hired by the Salvation Army as a driver. PSR ¶ 168. He stayed sober for three years.

He told the Probation Officer that those three sober years were "the happiest three years of my life." *Id.* This is important because the question for sentencing is not whether Mr. Navarrete-Contreras *can* function — he obviously can, given structure and support — but whether he has *had* such structure and support outside that single window. The answer, on this record, is plainly no. When relapse came, it came in the wake of a relationship breakup at the sober-living facility, and after years of unaddressed trauma. PSR ¶ 169. He has never had a mental health evaluation. PSR ¶ 153.

### 5. Manipulation by the Informant

Around age eighteen or nineteen, Mr. Navarrete-Contreras met an older man named Mr. A -- who became his employer at Big Bargain Appliances in Santa Maria, brought him to church, and presented himself as a father figure. Social History Report at 13. Maximo, in the words of the social history, "longing for the love and attention of a father, trusted Mr. A -- with all his heart." *Id.* In 2021, Mr. A -- was indicted in this

District in *United States v. A --*, Case No. 21-CR-[omitted]-MCS, on charges of methamphetamine distribution, possession of firearms in furtherance of drug trafficking, and felon in possession of firearms. He cooperated with the government to reduce his own sentence. *Id.* Mr. Navarrete-Contreras's adult life is full of older men who exploited his neediness and his cognitive limitations. The pattern is not coincidence; it is the predictable consequence of a childhood that left him unequipped to evaluate the people around him.

### 6.    Family Ties

Between twenty-eight and thirty-two, Mr. Navarrete-Contreras was in a long-term relationship with Cristal Peralta. PSR ¶ 146. They have two children together: Maximo Jordan Navarrete, Jr., now three, who has been diagnosed with autism; and Josiah Levi Navarrete, now one, whose heart is being monitored as a result of being born prematurely. *Id.* Ms. Peralta struggles with methamphetamine addiction and lost custody of the children, who are now being raised by Mr. Navarrete-Contreras's sister, Elizabeth, in Santa Maria. *Id.*

Before his arrest in November 2024, Mr. Navarrete-Contreras was deeply involved in his children's lives — dropping them off and picking them up from school, teaching the older children in the household to drive, and treating Cristal's older children as his own. Social History Report at 13. He told the Probation Officer that the hardest part of this case is being separated from his children. PSR ¶ 146.

He has been continuously detained since November 21, 2024 — approximately 18 months as of the sentencing date. *See* PSR (Release Status). He has not seen his children in person in that time.

### 7.    What Noe Says

Noe Mendoza has known Mr. Navarrete-Contreras since the day he was born. PSR ¶ 147. He described him to the Probation Officer "as a very kind, loyal, and genuine person." PSR ¶ 148. He told the Probation Officer:

11

Navarrete-Contreras taught one of Noe's children how to ride a bike and is very good with children. Noe's children view Navarrete-Contreras as an uncle. Noe advised Navarrete-Contreras is incredibly resilient and has the ability to do very well, as evidenced by his time in Santa Monica. Noe went on to say that Navarrete-Contreras has a very big heart, and is respectful and positive, despite the difficult life he has lived. PSR ¶ 148.

That description — resilient, kind, capable of doing very well with the right structure — is consistent with the record from his elementary school IEP, with his work history at the Salvation Army, with his role as a stepfather to children not biologically his own, and with the Probation Office's recommendation of the mandatory minimum.

**C.    The Need to Avoid Unwarranted Sentencing Disparity — § 3553(a)(6)**

A sentence at the mandatory minimum does little to avoid unwarranted disparity with the sentences imposed on Mr. Navarrete-Contreras's two co-defendants, who are at least as culpable for the firearms conduct.

- Luke Gregory Grabeel pled guilty to Counts Two, Three, and Thirteen — the conspiracy, dealing, and machinegun counts — and was sentenced on March 23, 2026 to 37 months' imprisonment. PSR ¶ 14. Grabeel is the man who built the firearms, who priced them, and who supplied them. PSR ¶¶ 22-30, 87.

- Felipe DeJesus Ortiz pled guilty to Counts Eleven and Twelve and was sentenced on March 2, 2026 to 96 months' imprisonment. PSR ¶ 15.

Mr. Navarrete-Contreras faces 120 months — *more than three times Grabeel's sentence and 24 months more than Ortiz's* — solely because he is the only one of the three charged with distributing methamphetamine on a single occasion in January 2024. He was characterized by the Probation Office as having "medium" culpability in the

12

firearms conspiracy, with both Grabeel and Ortiz at least equally culpable in that aspect of the case. PSR ¶ 88.

The Court's "duty to avoid unwarranted sentencing disparities" under § 3553(a)(6) is not a mechanical mandate, but it does counsel against pushing this defendant — by far the most personally damaged of the three — to a sentence well above what his more functional, more culpable co-defendants received. *Cf. United States v. Treadwell*, 593 F.3d 990, 1011 (9th Cir. 2010); *Gall v. United States*, 552 U.S. 38, 54 (2007). A sentence at the mandatory minimum is the only sentence in this case that respects the relative culpability of the three defendants.

### D. Just Punishment, Deterrence, and Public Protection

A 120-month sentence — ten years — is itself an enormous punishment. *See* 18 U.S.C. § 3553(a)(2)(A)-(C). Mr. Navarrete-Contreras is thirty-three years old. He has been continuously detained since November 21, 2024. By the time he is released, he will be approximately forty-three years old. His children will be teenagers. His sister Elizabeth, who is now raising his children, will be in her fifties. He will then serve five years of supervised release. *See* 21 U.S.C. § 841(b)(1)(A); USSG §§ 5D1.1, 5D1.2. He will be subject to drug testing, mental health treatment, employment requirements, and the full range of supervision conditions. He will carry a federal felony conviction for the rest of his life — with all the collateral consequences that entails. *See United States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073, at *1 (E.D.N.Y. May 24, 2016) ("In some ways, modern civil death is harsher and more severe than traditional civil death because there are now more public benefits to lose, and more professions in which a license or permit or ability to obtain a government contract is a necessity.").

Specific deterrence is fully accomplished by a 120-month term. As the Department of Justice's National Institute of Justice has acknowledged, "Sending an offender to prison isn't a very effective way to deter crime." *Available at*

13

https://ncjrs.gov/pdffiles1/nij/247350.pdf (last visited May 2026). What deters is certainty and swiftness — both of which Mr. Navarrete-Contreras has now experienced. He has been in continuous federal custody since his arrest. He has watched his children grow up in someone else's home. He will spend the next decade of his life in a federal prison. That is more than enough to communicate to him, and to those similarly situated, that the offense conduct here will be met with serious consequences.

General deterrence does not require an additional sixteen months. The mandatory minimum already encodes Congress's general-deterrence judgment for this offense conduct. Adding to it does not meaningfully add to the deterrent signal sent to others. Public protection is best served not by adding months to a ten-year term, but by ensuring that the period of incarceration is structured to address the substance abuse and untreated trauma that have driven Mr. Navarrete-Contreras's contact with the criminal-justice system since adolescence. The defense's specific requests in that regard are set forth below.

### E.    Rehabilitation

In addition to promoting respect for the law and providing just punishment for the offense, the statutory scheme contemplates rehabilitation as an important factor in the sentencing calculus. By enacting 18 U.S.C. § 3582, Congress explicitly recognized that imprisonment is "not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

Mr. Navarrete-Contreras has demonstrated, on the only occasion in his adult life when he was given access to a structured treatment environment, that he is fully capable of rehabilitation. His successful completion of the Salvation Army ARC program in 2016-17, and the three years of sobriety and steady employment that followed, are not a footnote — they are the most important data point in the

rehabilitation analysis. PSR ¶¶ 168-69. They show what this man becomes when he is sober, employed, housed, and supported.

The defense respectfully requests the following recommendations to the Bureau of Prisons:

1. Designation to the Residential Drug Abuse Program (RDAP). Mr. Navarrete-Contreras meets every criterion. He has a documented, severe, decades-long history of methamphetamine and polysubstance abuse. PSR ¶¶ 155-69. He has expressly requested participation in RDAP. PSR ¶ 169. He has previously completed a residential substance-abuse program successfully. PSR ¶ 168.

2. A mental health evaluation and treatment. Mr. Navarrete-Contreras has never had a mental health evaluation as an adult. PSR ¶ 153. The 2008 Shira evaluation documented borderline cognitive functioning, depressive and psychotic symptoms, and the consequences of severe early trauma. He has a documented traumatic brain injury, two prior suicide attempts, a history of childhood sexual abuse, and a Specific Learning Disability. He is amenable to evaluation and treatment.

3. Educational and vocational programming. Mr. Navarrete-Contreras has specialized skills in mechanics and welding. PSR ¶ 172. He aspires to obtain his welding certification. PSR ¶¶ 173, 176. The Bureau of Prisons should be encouraged to support that goal.

4. Designation to a facility as close to Santa Maria, California, as possible. Mr. Navarrete-Contreras's two young children — three-year-old Maximo Jr., who is autistic, and one-year-old Josiah, whose heart is being monitored — are being raised by his sister, Elizabeth, in Santa Maria. PSR ¶ 146. Maintaining contact with his children during the next decade is essential both to his rehabilitation and to their wellbeing. FCI Lompoc would best accommodate this request.

## IV.    CONCLUSION

For the reasons stated above, Mr. Navarrete-Contreras respectfully requests that the Court impose a combined sentence of 120 months.  Such a sentence is sufficient but not greater than necessary to further the interests of justice in this case.

Respectfully submitted,

DATED:  May 5, 2026                            By *Charles C. Brown*

                                                            CHARLES C. BROWN